**No. 23-55483**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

**L.A. TERMINALS, INC.,**
**SOCO WEST, INC.,**

*Plaintiffs-Appellees*,

v.

**UNITED NATIONAL INSURANCE COMPANY,**

*Defendant-Appellant*.

On Appeal from the United States District Court for the Central District
of California, Case No. 8:19-CV-00286-ODW
(The Honorable Otis D. Wright, II, District Judge)

### ANSWERING BRIEF FOR APPELLEES
### L.A. TERMINALS, INC. AND SOCO WEST, INC.

Brook B. Roberts
Steven Lesan
James A. Tabb
LATHAM & WATKINS LLP
12670 High Bluff Drive
San Diego, CA 92130
(858) 523-5400

Samir Deger-Sen
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10020
(212) 906-1200

Christine C. Smith
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
(202) 637-2200

June 27, 2024

*Counsel for Appellees L.A. Terminals, Inc. and Soco West, Inc.*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Appellees L.A. Terminals, Inc. and Soco West, Inc. certify that both are subsidiaries of Brilliant National Services Inc., which is a subsidiary of Ringwalt & Liesche Co., which is a subsidiary of Columbia Insurance Company, which is a subsidiary of BH Columbia Inc., which is a subsidiary of Berkshire Hathaway Inc. Berkshire Hathaway Inc. is the ultimate parent of all Plaintiffs-Appellees. Berkshire Hathaway Inc. is a publicly held corporation whose shares are traded on the New York Stock Exchange. Berkshire Hathaway Inc. has no parent corporation, and no publicly held corporation owns more than 10% of Berkshire Hathaway Inc.'s shares.

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ........................................................i

TABLE OF AUTHORITIES ...................................................................iv

INTRODUCTION ................................................................................1

STATEMENT OF JURISDICTION.........................................................4

STATEMENT OF THE ISSUES............................................................5

STATUTORY AUTHORITIES .............................................................6

STATEMENT OF THE CASE................................................................7

    A.    Factual Background...........................................................7

        1.    Plaintiffs' Insurance Policies ..................................7

        2.    United Breaches Its Duty to Defend LAT In State Court..........8

        3.    United Agrees To Defend The City Under The Same Insurance Policies In The Same State Court Action................10

        4.    United Agrees To Defend The City Under The Same Insurance Policies In A Related Federal Action......................11

        5.    Plaintiffs Sue United, Prompting United To Reverse Course And Agree To Defend LAT, But United Refuses To Provide The Independent, Non-Conflicted Counsel Required By California Law ......................................12

        6.    United Fails To Properly Segregate The City's and Plaintiffs' Files Even After It Agrees To Defend Plaintiffs ................................................................14

        7.    The City Amends Its State Court Complaint To Allege Sudden And Accidental Releases ...........................15

        8.    Plaintiffs Defend The Underlying Actions And United Refuses To Reimburse The Defense........................15

**Page**

B.    Procedural Background ...................................................16

      1.    Orders On Appeal ..................................................16

      2.    Post-Judgment Filings...........................................19

SUMMARY OF ARGUMENT ..............................................................20

ARGUMENT .......................................................................................26

I.     THE DISTRICT COURT CORRECTLY HELD THAT PLAINTIFFS' INITIAL TENDER TRIGGERED THE DUTY TO DEFEND...................26

    A.    The District Court Correctly Held That Plaintiffs' Initial Tender Triggered A Duty To Defend, Which United Failed To Conclusively Refute .......................................................28

    B.    United Misstates The Relevant Burdens .............................32

II.    THE DISTRICT COURT CORRECLTY HELD THAT PLAINTIFFS ARE ENTITLED TO INDEPENDENT COUNSEL ...................................38

    A.    California Law Requires Independent Counsel Where There Is A Conflict Of Interest Between The Insurer and The Insured...............39

    B.    It Is A Conflict Of Interest For United To Retain Counsel For Adversary-Insureds In The Same Litigation .......................................39

    C.    United's Reservation Of Rights Created A Conflict Of Interest ........44

    D.    United Breached Its Defense Obligations And Therefore Forfeited Its Right To Control Plaintiffs' Defense ............................48

III.   THE DISTRICT COURT CORRECLTY HELD THAT PLAINTIFFS DID NOT FAIL TO MITIGATE THE COST OF UNITED'S BREACH ...........................................................................................50

IV.   THE DISTRICT COURT CORRECTLY ORDERED UNITED TO PAY DEFENSE COSTS IN FULL ................................................................53

CONCLUSION....................................................................................58

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*A-H Plating, Inc. v. American National Fire Insurance Co.*,
 57 Cal. App. 4th 427 (1997) ...............................................................37

*Aerojet-General Corp. v. Transport Indemnity Co.*,
 17 Cal. 4th 38 (1997) ...........................................................19, 24, 51

*All Green Electric, Inc. v. Security National Insurance Co.*,
 22 Cal. App. 5th 407 (2018) ..............................................................35

*American Motorists Insurance Co. v. Superior Court*,
 68 Cal. App. 4th 864 (1998) ...............................................................57

*American States Insurance Co. v. Sacramento Plating, Inc.*,
 861 F. Supp. 964 (E.D. Cal. 1994), *aff'd*, 99 F.3d 1145
 (9th Cir. 1996)......................................................................................37

*Anthem Electronics, Inc. v. Pacific Employers Insurance Co.*,
 302 F.3d 1049 (9th Cir. 2002) ....................................................*passim*

*Arrowood Indemnity Co. v. Bel Air Mart*,
 No. 2:11-cv-976, 2014 WL 841314 (E.D. Cal. Mar. 4, 2014) ...........37

*Banister v. Davis*,
 590 U.S. 504 (2020)................................................................................4

*Bayer v. Neiman Marcus Group, Inc.*,
 861 F.3d 853 (9th Cir. 2017) ..................................................26, 55, 56

*Brandon & Tibbs v. George Kevorkian Accountancy Corp.*,
 226 Cal. App. 3d 442 (1990) ...................................................25, 50, 51

*Buss v. Superior Court*,
 16 Cal. 4th 35 (1997) ...........................................................................54

*Centex Homes v. St. Paul Fire & Marine Insurance Co.*,
 19 Cal. App. 5th 789 (2018) ................................................................42

iv

**Page(s)**

*Centex Homes v. St. Paul Fire & Marine Insurance Co.*,
 237 Cal. App. 4th 23 (2015) .................................................................41

*Continental Casualty Co. v. Royal Insurance Co. of America*,
 219 Cal. App. 3d 111 (1990) ........................................................25, 52

*Department of the Treasury-Internal Revenue Service*
 *v. Federal Labor Relations Authority*,
 521 F.3d 1148 (9th Cir. 2008) ......................................................26, 55

*Eigner v. Worthington*,
 57 Cal. App. 4th 188 (1997) ...............................................................49

*Emerald Bay Community Association v. Golden Eagle*
 *Insurance Corp.*,
 130 Cal. App. 4th 1078 (2005) ...............................................51, 52, 53

*Federal Insurance Co. v. MBL, Inc.*,
 219 Cal. App. 4th 29 (2013) .........................................................42, 47

*Feld v. Fireman's Fund Insurance Co.*,
 No. 12-1789, 2019 WL 1453314 (D.D.C. Apr. 2, 2019) ...................57

*Finato v. Fink*,
 803 F. App'x 84 (9th Cir. 2020) .........................................................57

*Foxfire, Inc. v. New Hampshire Insurance Co.*,
 Nos. C-91-2940, C-91-4364, 1994 WL 361815
 (N.D. Cal. July 1, 1994)......................................................................57

*Gon v. First State Insurance Co.*,
 871 F.2d 863 (9th Cir. 1989) ..............................................................55

*Gray v. Zurich Insurance Co.*,
 65 Cal. 2d 263 (1966) ...................................................................29, 34

*Hollyway Cleaners & Laundry Co.*
 *v. Central National Insurance Co. of Omaha, Inc.*,
 219 F. Supp. 3d 996 (C.D. Cal. 2016) ..........................................47, 48

v

**Page(s)**

*Intergulf Development LLC v. Superior Court*,
   183 Cal. App. 4th 16 (2010) ........................................................24, 49

*James 3 Corp. v. Truck Insurance Exchange*,
   91 Cal. App. 4th 1093 (2001) ....................................................42, 46

*Jun Yu v. Idaho State University*,
   No. 4:15-cv-00430, 2019 WL 845866 (D. Idaho Feb. 21, 2019)......................56

*Los Angeles Lakers, Inc. v. Federal Insurance Co.*,
   869 F.3d 795 (9th Cir. 2017) ....................................................28, 35

*Lutz v. Glendale Union High School*,
   403 F.3d 1061 (9th Cir. 2005) ...........................................................56

*MacKinnon v. Truck Insurance Exchange*,
   31 Cal. 4th 635 (2003) ......................................................................46

*Montrose Chemical Corp. v. Superior Court*,
   6 Cal. 4th 287 (1993) ...............................................................*passim*

*Northern Insurance Co. of New York v. Allied Mutual Insurance Co.*,
   955 F.2d 1353 (9th Cir. 1992) ..................................................24, 44

*O'Morrow v. Borad*,
   27 Cal. 2d 794 (1946) .............................................22, 23, 40, 41, 42

*Olson v. Morris*,
   188 F.3d 1083 (9th Cir. 1999) ............................................24, 38, 49

*Olympic Club v. Those Interested Underwriters at Lloyd's London*,
   991 F.2d 497 (9th Cir. 1993) ...........................................................36

*Pension Trust Fund for Operating Engineers v. Federal
   Insurance Co.*,
   307 F.3d 944 (9th Cir. 2002) ...........................................................30

*Previews, Inc. v. California Union Insurance Co.*,
   640 F.2d 1026 (9th Cir. 1981) .........................................................39

**Page(s)**

*San Diego Navy Federal Credit Union v. Cumis Insurance Society, Inc.*,
162 Cal. App. 3d 358 (1984) .................................................39, 44, 47

*Scottsdale Insurance Co. v. MV Transportation*,
36 Cal. 4th 643 (2005) ...........................................2, 17, 28, 32, 34

*Seaboard Music Co. v. Germano*,
24 Cal. App. 3d 618 (1972) .............................................52, 53

*Sempra Energy v. Associated Electric & Gas Insurance Services Ltd.*,
473 F. Supp. 3d 1052 (C.D. Cal. 2020) ..............................48

*Shade Foods, Inc. v. Innovative Products Sales & Marketing, Inc.*,
78 Cal. App. 4th 847 (2000) ..............................................49

*Shaffer v. Debbas*,
17 Cal. App. 4th 33 (1993) ...............................................50

*Shell Oil Co. v. Winterthur Swiss Insurance Co.*,
12 Cal. App. 4th 715 (1993) ........................................31, 46

*Sony Computer Entertainment America, Inc. v. American Home Assurance Co.*,
532 F.3d 1007 (9th Cir. 2008) ......................................33, 34

*Staefa Control-System Inc. v. St. Paul Fire & Marine Insurance Co.*,
847 F. Supp. 1460 (N.D. Cal. 1994) ..............................31

*State Farm Mutual Automobile Insurance Co. v. Federal Insurance Co.*,
72 Cal. App. 4th 1422 (1999) ..................................23, 39, 44

*United States Fidelity & Guaranty Co. v. Superior Court*,
204 Cal. App. 3d 1513 (1988) ..........................................57

*Vann v. Travelers Cos.*,
39 Cal. App. 4th 1610 (1995) ..........................................31

## STATUTES

11 U.S.C. § 362 ....................................................................20

vii

**Page(s)**

11 U.S.C. § 362(a)(1)..............................................................................19

28 U.S.C. § 1332 .....................................................................................4

Cal. Civ. Code § 2860(a) ...................................................................22, 39

Cal. Civ. Code § 2860(b) ........................................................................44

## OTHER AUTHORITIES

H. Walter Croskey et al., *Insurance Litigation* (Rutter Aug. 2023
    update).............................................................................................25, 51

Jordan R. Plitt et al., *Couch on Insurance* (3d ed. June 2024 update)..............40, 41

## INTRODUCTION

This case arises out of a common tale: an insurer's obstinate refusal to provide the insurance coverage it promised. Defendant United National Insurance Company ("United") wrongfully denied a defense to Plaintiffs L.A. Terminals ("LAT") and Soco West ("Soco") for the underlying lawsuit against them. There is no serious dispute that this denial constituted a breach of United's duty to defend. Indeed, even as United *denied* coverage to Plaintiffs, United *accepted* the defense of Plaintiffs' adversary in the underlying litigation, the City of Los Angeles (the "City")—under the exact same facts and the exact same insurance policies.

After Plaintiffs were forced to defend themselves for nearly a year, prompting Plaintiffs to file this lawsuit to obtain a declaration that United must honor its defense obligations, United finally acknowledged its duty to defend, while reserving the right to withdraw its defense if certain findings were made in the underlying litigation. But United's promise to defend proved to be a hollow gesture for two important reasons. First, United refused to reimburse any of Plaintiffs' past defense costs. Second, despite the clear conflicts of interest in representing Plaintiffs' direct adversary in the underlying litigation and reserving rights on issues central to the case, United refused to permit Plaintiffs to maintain their existing independent counsel, who by that time had been representing Plaintiffs in the underlying

litigation for nearly fourteen months. As a result, United once again refused to pay any of Plaintiffs' ongoing defense costs.

Faced with this flagrantly unlawful conduct, the District Court granted summary judgment to Plaintiffs, concluding that United had breached its duty to defend by rejecting Plaintiffs' initial tender of the complaint and by depriving Plaintiffs of the independent counsel to which they were entitled. The District Court further ordered United to pay all of Plaintiffs' defense costs incurred to the present date. Yet to this day, United still has not paid a single cent of the more than six years of defense costs submitted for payment.

On appeal, United does not dispute these fundamental facts but instead mischaracterizes the law and the District Court's opinion at every turn.

As to its duty to defend, United attempts to avoid the clear California case law relied on by the District Court by brazenly misstating the parties' respective burdens of proof. Hornbook California law states that "the insured need only show that the underlying claim *may* fall within the policy coverage; the insurer must prove it *cannot.*" *Montrose Chem. Corp. v. Super. Ct*., 6 Cal. 4th 287, 300 (1993). More specifically, the insured must show either that a potential for coverage can be "reasonably infer[red]" from the complaint, *Scottsdale Ins. Co. v. MV Transp.*, 36 Cal. 4th 643, 654 (2005), or that the complaint "might be amended to give rise to a liability that would be covered under the policy," *Montrose*, 6 Cal. 4th at 299

(citation omitted). By contrast, once the insured has made that showing, the insurer must "conclusively eliminate a potential for liability" in order to avoid its defense obligations. *Id*. at 298-99 (citation omitted).

Here, United has never tried to "conclusively" prove that the City's complaint could not fall within its policy coverage, *id*. at 299—nor could it. The City's original complaint plainly raised the possibility of coverage from the outset. Moreover, the City later amended its complaint to describe the same leaks, spills, and releases of hazardous substances at issue in its initial complaint, but using the exact "magic words" United claimed were needed. Those words were not required under the law, but the fact that the complaint was amended to include them just underscores that United had a duty to defend from the outset.

As to its duty to provide independent counsel, United likewise tries to obfuscate the law. But California precedent is clear that insurers must provide independent counsel whenever a conflict of interest arises between the insurer and its insured. Such a conflict is manifest when (1) the insurer is charged with defending two insureds who are direct adversaries in the underlying litigation, or (2) the insurer's reservation of rights on a given coverage issue can be controlled by counsel retained by the insurer. Both circumstances apply here, as the District Court correctly held. And, in any event, United forfeited its right to control Plaintiffs' defense by breaching its duty to defend in the first place.

Finally, United's attempts to get out of paying defense costs by claiming that Plaintiffs somehow failed to mitigate their harms, and that the District Court erred by ordering United to pay defense costs, are equally unavailing. Contrary to United's argument, the duty to mitigate does not require Plaintiffs to take on *additional* harms, solely to benefit the contract *breacher*. California law is clear that Plaintiffs were entitled to pursue, at their election, a complete defense from whatever insurance policy was most beneficial to Plaintiffs. Moreover, the Seventh Amendment poses no barrier to recovery of the defense costs owed to Plaintiffs because the District Court properly ordered equitable relief.

For all those reasons, the District Court's sound decision should be affirmed.

## STATEMENT OF JURISDICTION

Plaintiffs agree that the District Court had diversity jurisdiction over this action under 28 U.S.C. § 1332 because complete diversity exists between the parties and the amount in controversy exceeds $75,000. 3-ER-546; *see* Br. 11 (stating each party's citizenship). However, Plaintiffs disagree that there is a final judgment. *See* Br. 11. While the District Court entered a judgment on December 29, 2022, 1-ER-3–4, its finality was "suspend[ed]" when both parties timely filed motions to alter or amend the judgment under Federal Rule of Civil Procedure 59(e), *Banister v. Davis*, 590 U.S. 504, 508 (2020) (citation omitted); *see* 2-ER-96–103. The District Court never ruled on those motions on the merits. Instead, after Plaintiffs declared

bankruptcy, the District Court stayed the case and "denied" the parties' motions "without prejudice and as moot," advising that the parties "may renew their motions" "[u]pon the stay being lifted." 1-ER-2. While the stay was still in force, United filed a "precaution[ary]" Notice of Appeal, noting that it "may be premature in light of the District Court's instruction that the parties 'may renew their [Rule 59(e)] motions.'" 3-ER-576–77. Plaintiffs filed a Motion to Hold the Appeal in Abeyance and Remand in this Court, arguing that there was no final judgment because Plaintiffs' Rule 59(e) motion was still pending and had never been resolved on the merits. ECF No. 16. This Court denied the motion "without prejudice to renewal in the event the district court issues an indicative ruling that it would grant the post-judgment motion or that the motion raises a substantial issue." ECF No. 23 at 1. Plaintiffs subsequently filed a motion in the District Court requesting such a ruling, Dkt. 202, which the District Court has not yet addressed. Plaintiffs continue to believe this Court lacks jurisdiction. *See* ECF Nos. 16, 22.

## STATEMENT OF THE ISSUES

**I.** Whether the District Court correctly held that United breached its duty to defend where Plaintiffs raised a "potential" for coverage and United failed to "conclusively refute that potential." *Anthem Elecs., Inc. v. Pac. Emps. Ins. Co.*, 302 F.3d 1049, 1054 (9th Cir. 2002) (quoting *Montrose*, 6 Cal. 4th at 299).

**II.**   Whether the District Court correctly held that Plaintiffs are entitled to independent counsel (i.e., counsel selected by Plaintiffs) where (a) United attempted to represent direct adversaries in the underlying litigation; (b) United could have controlled the determination of whether Plaintiffs' defense was covered by its insurance policies through the underlying litigation on an issue on which it had reserved its rights; and (c) United breached its duty to defend, thereby forfeiting its right to select counsel and control the litigation in any case.

**III.**   Whether the District Court correctly held that Plaintiffs did not owe a duty to mitigate by accepting a supplementary defense from their excess insurer that would erode their excess indemnification limits and thereby exacerbate the harm caused by United's breach of its contractual duty to defend.

**IV.**   Whether the District Court correctly ordered United to pay past and future defense costs as equitable relief after United continued to refuse to pay a single cent following the District Court's entry of declaratory judgment.

**STATUTORY AUTHORITIES**

Pertinent authorities are set forth in the attached addendum.

## STATEMENT OF THE CASE

### A.    Factual Background

#### 1.    Plaintiffs' Insurance Policies

Plaintiff LAT is a former tenant of the City and Port of Los Angeles.  3-ER-547.  Plaintiff Soco is alleged to have operated at the relevant site at the same time as LAT.  3-ER-549.  Both Plaintiffs' operations allegedly included chemical storage and distribution on the City's properties.  *Id.*  Those properties have been the subject of environmental investigations over the past 30 years.  3-ER-547.

From 1982 to 1985, Plaintiffs maintained four comprehensive general liability insurance policies with United.  3-ER-435–517; 3-ER-519.  Three policies identified the City as an additional insured.  3-ER-519.  Under the policies, United (1) must "pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of . . . property damage to which this insurance applies"; and (2) "shall have the right and duty to defend any suit against the insured seeking damages on account of such . . . damage."  3-ER-520.

The policies contain an exclusion referred to as the "Qualified Pollution Exclusion," which limits coverage for property damage "arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water."

7

*Id.* However, the Qualified Pollution Exclusion also includes an important exception, stating that "this exclusion does not apply if such discharge, dispersal, release or escape is *sudden and accidental*." *Id.* (emphasis added). The dispute between Plaintiffs and United centers on this exception.

Plaintiffs also maintained excess liability insurance policies with Granite State Insurance Company ("AIG"), which attached above certain of the United policies. One of the AIG excess policies has a supplemental defense provision with "declining limits." 2-ER-202–03, 222–24; 2-ER-294–308. Under a declining limits policy, Plaintiffs' total policy limits are reduced by the amount the insurer spends in satisfaction of its defense. *See id.* In other words, every dollar spent on defense is one less dollar available for indemnification, and the defense ends when the limits of the policy are exhausted. *See id.* By contrast, under the primary insurance policies issued by United, defense costs are in *addition* to any policy limits for indemnification, and there is no cap on United's defense obligation. 3-ER-501.

### 2. United Breaches Its Duty to Defend LAT In State Court

On March 6, 2018, the City sued LAT and other former tenants of the Port in state court. *See* 3-ER-408–34. The City's First Amended Complaint broadly alleged that LAT "fail[ed] to document and report and clean up all leaks, spills, and releases of hazardous substances, thereby resulting in the pollution and contamination of the soil and groundwater on and under the Site premises." 3-ER-521 (quoting

complaint); *see* 3-ER-408–34 (complaint). The complaint further alleged that LAT and others were "negligent" in their "storing and handling of hazardous substances." 3-ER-416. The City's allegations were not limited to damage solely caused by intentional releases over long periods of time, nor did it specify the precise manner in which the "leaks, spills, and releases" allegedly occurred. 3-ER-521.

In April 2018, as part of its "strategy for defending" the underlying state court action, LAT filed counterclaims, 3-ER-549,[1] alleging that other former tenants such as Occidental Chemical Corporation ("Occidental") were in fact the responsible parties and that the City and those tenants were liable for the alleged contamination. LAT alleged that the purported contamination was "caused by various sudden and accidental releases, and other discharges and releases of [h]azardous [m]aterials." 3-ER-522.

On May 4, 2018, LAT tendered the City's First Amended Complaint to United for a defense and put its other excess insurers on notice of the claim. 3-ER-406–07. On August 6, 2018, United "disclaim[ed] any duty to defend or indemnify" LAT. 3-ER-376. United stated that it "owe[d] no duty" because the City's complaint did not

---

[1] LAT initially removed the case to federal court and filed counterclaims. 3-ER-522. When the case was remanded to state court, LAT filed cross-claims repeating the same allegations. 3-ER-523–24.

9

*specifically* "allege that any of these discharges, dispersals, releases or escapes were 'sudden and accidental.'" 3-ER-379.

Not only did LAT dispute United's coverage decision as contrary to California law, so did AIG—the excess insurer above United. Specifically, AIG stated that it "disagree[d] with United['s] position" and "d[id] not believe that [United] ha[d] grounds to deny a duty to defend." 2-ER-327–28. Although AIG's supplemental defense obligations did not formally attach "until and unless it is shown that [United] . . . has no obligation to provide a defense," AIG agreed to provide a conditional, supplemental defense in the event that "no other carrier has provided a defense." *Id.*

As LAT's excess insurer, however, any supplemental defense costs paid by AIG would have reduced LAT's declining limits coverage under the AIG policies on a dollar-for-dollar basis. 2-ER-203; 2-ER-222–24. Moreover, any defense provided by AIG would have been temporary because AIG would have stopped defending once the limits of the policy were exhausted. LAT therefore chose to continue to pursue the complete duty to defend it was rightfully owed by United rather than impair its excess coverage under the AIG policies.

### 3. United Agrees To Defend The City Under The Same Insurance Policies In The Same State Court Action

In June 2018, the City tendered LAT's counterclaims in the state court action to United for a defense. 3-ER-523. On September 18, 2018, United agreed to defend the City—in the same action, related to the same alleged property damage, and under

10

the same insurance policies—despite its earlier and ongoing refusal to defend LAT. 3-ER-356–63. United acknowledged that the "cross-action [wa]s, of course, largely premised on the events at issue in the . . . main action." 3-ER-361. Nevertheless, United agreed to defend the City purportedly because LAT's "cross-complaint assert[ed] that some of the [alleged contamination] was 'caused by various sudden and accidental releases.'" 3-ER-362 (citation omitted). United's insurance adjuster reviewing both insureds' claims, Randi Hoffman, later explained that the "difference between the two determinations" was based on "the way the pleadings were pled." SER-27 (Hoffman Depo. 152:22–25).

### 4. United Agrees To Defend The City Under The Same Insurance Policies In A Related Federal Action

On August 6, 2018, "[a]s part of [its] same overall defense strategy," LAT filed a separate federal action against the City and other entities regarding the same environmental contamination. 3-ER-550; *see* 3-ER-383. The federal complaint alleged that the pollution was caused by "various sudden and accidental releases." 3-ER-383, 385. Like the state court action, United agreed to defend the City against LAT's claims. 3-ER-366–73.

     **5.**     **Plaintiffs Sue United, Prompting United To Reverse Course And Agree To Defend LAT, But United Refuses To Provide The Independent, Non-Conflicted Counsel Required By California Law**

Because United refused to defend LAT in the state action, LAT filed suit asserting that United had failed to comply with its defense obligations. 3-ER-570.[2] Around the same time, Occidental, a previous tenant of the site and a defendant in the federal action, countersued LAT in the federal action, while also adding Soco as a third-party defendant. 3-ER-525–27. Like the City's complaint in the state court action, Occidental's pleadings broadly described the alleged release of hazardous substances and addressed Plaintiffs' purported responsibility. Occidental alleged that Plaintiffs were responsible for, among other descriptions, "sudden and accidental releases" of hazardous materials. 3-ER-526.

On February 15, 2019, LAT and Soco tendered these claims to United for a defense. 3-ER-527. LAT, now joined by Soco, also filed a first amended complaint in this case seeking to confirm a defense for both underlying lawsuits. 3-ER-581 (Dkt. 14). On April 12, 2019, after answering Plaintiffs' complaint and denying that Plaintiffs were entitled to relief, United reversed its previous position, and nominally agreed to defend Plaintiffs in the federal action and LAT in the state action.

---

[2] Soco later joined as a co-plaintiff. 3-ER-568; 3-ER-545. Although LAT originally filed in state court, 3-ER-570, United removed to federal court, 3-ER-572–75.

However, United's (belated) agreement to defend Plaintiffs was pursuant to a reservation of rights under the policies' "Qualified Pollution Exclusion." 2-ER-334–43. Specifically, United reserved "the right to disclaim indemnity and the right to withdraw from defending [Plaintiffs] should it be discovered that no 'sudden and accidental' releases did, in fact, occur," including reserving "the right to seek reimbursement or recoupment from [Plaintiffs]." 2-ER-342.

United also informed Plaintiffs that it would appoint Demler Armstrong & Rowland LLP as new defense counsel in both actions. 3-ER-527. At the same time, United continued to deny in this case that it owed any defense obligations to Plaintiffs whatsoever. 3-ER-537–38. Plaintiffs responded that they were entitled to independent counsel for several reasons. SER-33–34. First, United "plainly and unambiguously breached its contractual obligations under the Policies by not accepting LAT's defense of the State Court Action first tendered over one year ago," and as a result, had "forfeit[ed] any right to control the Insureds' defense." SER-33. Second, United's reservation of rights "create[d] a disqualifying conflict of interest" because United's "retained counsel would have an interest in developing facts establishing that any alleged discharge of pollutants" was not "sudden." SER-33–34. Finally, United had "conflicting obligations to other parties in the Underlying Actions, including [Plaintiffs'] direct adversary in these matters, the City of Los Angeles." SER-34. Therefore, Plaintiffs insisted on their right to an independent

13

defense through their existing counsel, Rutan & Tucker LLP, who—by that point—had been conducting the defense for over a year.  3-ER-528.

United refused to permit Plaintiffs to use their existing independent counsel, and refused to pay any defense costs already incurred.  3-ER-528; 1-ER-11.

### 6. United Fails To Properly Segregate The City's and Plaintiffs' Files Even After It Agrees To Defend Plaintiffs

Even though they were adversaries in the underlying litigation, United maintained a unified claims file for Plaintiffs and the City—managed by a single claims professional (Randi Hoffman)—until at least April 2019, when United agreed to defend Plaintiffs.  3-ER-395; 3-ER-528.  Even after that date, United failed to properly segregate the claims files.  On May 3, 2019, Hoffman emailed the *complete* claims files for both insureds to new claims adjusters.  2-ER-212.  The new adjuster assigned to Plaintiffs, Doreen Nielsen, responded that her file contained "a report from [the law] firm . . . *defending the City of L.A.*"  2-ER-211 (emphasis added).  In response, Hoffman stated that she purposely "left [the report] there so you could get a sense of what's going on since you['re] brand new to the claim."  2-ER-210.  Hoffman told Nielsen, "[y]ou *can* delete from your file anything relating to the defense of the City," but did not direct Nielsen to do so.  *Id.* (emphasis added).

**7.    The City Amends Its State Court Complaint To Allege Sudden And Accidental Releases**

In May 2019, the City filed a Second Amended Complaint in the state court action, reinforcing its initial broad allegations and confirming that it was pursuing claims for damages caused by hazardous substances that were "spilled, leaked, discharged, poured, and released, suddenly and accidentally, and over long periods of time." 3-ER-529. This amendment only underscored what LAT told United from the beginning: the underlying litigation came within the exception to the Qualified Pollution Exclusion because it at least potentially (and, later, expressly) involved allegations of "sudden and accidental" releases. The City also added Soco as a defendant in its amended complaint. *Id.*

**8.    Plaintiffs Defend The Underlying Actions And United Refuses To Reimburse The Defense**

Plaintiffs took reasonable and appropriate steps to defend their interests in both the federal and state cases through independent counsel. Invoices documenting the amount of defense expenses were contemporaneously submitted to United for payment. *See* SER-9–22. And United never questioned, much less affirmatively challenged, the reasonableness or necessity of these costs at the time they were submitted. SER-21. Instead, United wrongly refused to pay on the ground that it owed no duties to Plaintiffs, forcing Plaintiffs to fund their own defense—even as to

costs that United "agree[d] [were] reasonable and applicable." 1-ER-11.  Today, the total amount of defense fees incurred and submitted to United is $7,647,276.50.

**B.    Procedural Background**

**1.    Orders On Appeal**

Plaintiffs' operative complaint alleged that United had breached its duty to defend and failed to provide independent counsel required by law.  3-ER-559–63 (¶¶ 55-72).[3]  United moved to dismiss that complaint on the ground that United owned no duty to defend Plaintiffs, which the District Court rejected.  *See* 1-ER-33–47.  The District Court ruled that "Plaintiffs showed there was a potential that the alleged environmental contamination was sudden and accidental" and therefore covered by the insurance policies, and that United failed to "conclusively refute that potential."  1-ER-41.  The Court further held that agreeing "to defend 'truly adverse plaintiffs and defendants, not co-defendants,' . . . rais[ed] an untenable conflict of interest," requiring independent counsel.  1-ER-45 (citation omitted).  Despite these holdings, United neither reversed course nor paid any of Plaintiffs' defense costs.

Plaintiffs were thus forced to file a summary judgment motion, and the District Court reiterated its prior guidance in granting partial summary judgment to Plaintiffs.  The District Court held that (1) "United owed a duty to defend from May

---

[3]    Plaintiffs also alleged a breach of the covenant of good faith and fair dealing, but the parties later settled that claim.  3-ER-563–65 (¶¶ 73-77); 3-ER-596 (Dkts. 152, 154).

4, 2018" (the date of Plaintiffs' initial tender of the state court complaint); (2) "Plaintiffs [were] entitled to independent counsel to be [paid for] by United"; and (3) "United breached its duty to defend [Plaintiffs]." 1-ER-31.

First, the District Court explained that an insurer's duty to defend is broader than its duty to indemnify, and that the duty to defend "arises as soon as the insured tenders a claim that involves a *potentially* covered loss." 1-ER-21 (emphasis added) (citation omitted). As such, the duty to defend arises "'where, under the facts alleged, reasonably inferable, or otherwise known, the complaint could fairly be amended to state a covered liability.'" *Id.* (quoting *Scottsdale Ins. Co. v. MV Transp.*, 36 Cal. 4th 643, 654 (2005)). The District Court held that "it was 'reasonably inferable' from the allegations that the claim was at least 'potentially covered by the policy.'" 1-ER-22 (quoting *Scottsdale Ins. Co.*, 36 Cal. 4th at 654). The City's complaint "alleged that LAT was negligent in handling hazardous substances and chemicals"—an allegation that "was broad enough to include 'accidental'" and "'sudden'" releases. *Id.* (citation omitted). Indeed, Plaintiffs' counterclaims and the related federal litigation all alleged "sudden and accidental" discharges arising out of the same circumstances. *See* 3-ER-522–24; 1-ER-42. And the City itself later amended its complaint to specifically allege sudden and accidental discharges. 1-ER-42.

Second, the District Court held that Plaintiffs had a right to independent counsel, for two reasons. 1-ER-23–27. First, under California Civil Code section 2860, United's agreement to defend direct adversaries in the underlying litigation created a conflict of interest that was "actual and significant." *Id.* The Court found that United's belated segregation of the claims files did not alleviate this conflict, and, in any event, there was no effective segregation because United "*sent the master claims files to both sides*," including a report prepared by the City's legal counsel. 1-ER-25. Second, United's reservation of rights independently required independent counsel because "by controlling Plaintiffs' defense, United would have the ability to direct a more vigorous defense against a liability theory based on ongoing, deliberate pollution (which precludes Plaintiffs' coverage)." 1-ER-26–27. The District Court did not reach Plaintiffs' third argument that United had forfeited its right to control Plaintiffs' defense by breaching its duty to defend. 1-ER-24.

Finally, the District Court rejected United's argument that it had not breached its duty to defend because it eventually accepted Plaintiffs' defense. 1-ER-27–29. The Court reiterated that United was required to accept LAT's defense from the initial tender, even if the complaint did not use the specific phrase "sudden and accidental." *See* 1-ER-22, 28–29. The Court also held that United's continued refusal to pay "one cent of LAT's defense costs," including costs for independent counsel, constituted a further "breach of United's defense obligations." 1-ER-29.

The Court also rejected United's argument that Plaintiffs failed to mitigate the harm because United "owed a duty to defend its insureds, 'separate and independent' from any other insurer." 1-ER-30 (quoting *Aerojet-General Corp. v. Transp. Indem. Co.*, 17 Cal. 4th 38, 70 (1997)).

Following further briefing, the District Court issued an "Order to Pay Defense Costs In Full." 1-ER-5. In that order, the Court explained that "United continues to refuse to pay Plaintiffs any of their defense costs, despite the Court's orders finding United is obligated to defend Plaintiffs." 1-ER-8. Therefore, the Court exercised its equitable authority to "effectuate its prior rulings" and "administer complete relief" by ordering United to pay all past and future defense costs. 1-ER-11 (citation omitted). The District Court then entered judgment. 1-ER-3–4.

### 2. Post-Judgment Filings

Both parties timely filed post-judgment motions under Federal Rule of Civil Procedure 59(e). 2-ER-96–103. Before the District Court ruled on these motions, LAT filed for bankruptcy. 2-ER-52–90. After United alerted the District Court to the bankruptcy, the Court stayed the case citing the automatic bankruptcy stay provision. 1-ER-2; *see* 11 U.S.C. § 362(a)(1). In its stay order, the District Court "DENIED without prejudice and as moot" both parties' post-judgment motions, with the option to "renew their motions" "[u]pon the stay being lifted." 1-ER-2. United then filed a Notice of Appeal, acknowledging that the Ninth Circuit may "find[] this

appeal premature" because the District Court instructed that "the parties 'may renew their [post-judgment] motions.'" 3-ER-576–77 (citation omitted). The parties subsequently informed the District Court that the bankruptcy stay provision did not apply, because it applies only to claims *against* the debtor (not claims *by* the debtor). 3-ER-601 (Dkt. 200); *see* 11 U.S.C. § 362. Plaintiffs urged the Court to lift the stay and rule on Plaintiffs' Rule 59(e) motion. 3-ER-601 (Dkt. 200). On August 16, 2023, the District Court lifted the stay but declined to rule on Plaintiffs' motion, stating that "Defendant's appeal to the Ninth Circuit deprives this Court of jurisdiction." 2-ER-50.

Plaintiffs filed a Motion to Remand in this Court, arguing that there was no final judgment because the District Court had not ruled on the merits of Plaintiffs' still-pending Rule 59(e) motion. ECF No. 16; *see also* ECF No. 22. This Court denied the motion "without prejudice to renewal in the event the district court issues an indicative ruling that it would grant the post-judgment motion or that the motion raises a substantial issue." ECF No. 23. On June 6, 2024, Plaintiffs filed a motion in the District Court informing the Court of the Ninth Circuit's ruling and requesting an indicative ruling, Dkt. 202, which United opposed, Dkt. 203.

## SUMMARY OF ARGUMENT

**I.** The District Court correctly held that Plaintiffs' initial tender of the state court complaint triggered United's duty to defend. Under California law, an

insured's duty to defend is "very broad" and is triggered as soon as the insured tenders a claim that is "'*potentially* covered under the policy.'" *Anthem Elecs.*, 302 F.3d at 1054 (quoting *Montrose*, 6 Cal. 4th at 299). Once the insured does so, "the insurer must assume its duty to defend unless and until it can *conclusively* refute that potential." *Id.* (quoting *Montrose*, 6 Cal. 4th at 299).

Here, Plaintiffs met their minimal burden to show a "potential" for coverage through their initial tender of the City's state court complaint. There is a potential for coverage whenever "the underlying complaint" either "alleges the insured's liability for damages potentially covered under the policy" or "might be amended to give rise to a liability that would be covered under the policy." *Montrose*, 6 Cal. 4th at 299 (emphasis omitted).

The City's initial complaint met both prongs. Although it did not use the exact words "sudden and accidental," no such magic words are required under California law. All that matters is that the complaint raise the *potential* for coverage—and the City's complaint plainly did, because it broadly alleged that LAT had been negligent with respect to its handling, storage, and release of hazardous chemicals. Moreover, the complaint easily could have been amended—and, in fact, subsequently *was amended*—to state that the alleged contamination resulted at least in part from "sudden and accidental" releases. Therefore, Plaintiffs met their initial burden to show a "potential" for coverage.

By contrast, United did not even try to meet its heavy burden to "conclusively refute that potential." *Anthem*, 302 F.3d at 1054 (citation omitted). Instead, United simply contended—as it does now—that it owed no duty to defend because the City's complaint did not use the exact words "sudden and accidental," and Plaintiffs did not submit extrinsic evidence that the discharges were, in fact, sudden and accidental. That is a blatant attempt to flip the burden established by the case law: "the insured need only show that the underlying claim *may* fall within the policy coverage; the insurer must prove it *cannot.*" *Montrose*, 6 Cal. 4th at 300. Under a straightforward application of settled law, United breached its duty to defend—and United has no serious argument otherwise.

**II.** The District Court was likewise correct in finding that Plaintiffs were entitled to independent counsel (i.e., counsel of their choice paid for by United). California law requires insurers to pay for independent counsel where a conflict of interest requires it. Cal. Civ. Code § 2860(a). The District Court found two distinct conflicts of interest requiring independent counsel.

First, there is an obvious conflict of interest requiring independent counsel where the insurer has a duty to defend two directly adverse parties in a litigation. *See, e.g.*, *O'Morrow v. Borad*, 27 Cal. 2d 794, 799 (1946) (requiring independent counsel where insurer represented plaintiff and defendant in car crash). This simple rule is rooted in the fundamental principle that "a person [cannot] control both sides

22

of [a] litigation." *Id.* at 798. An insurer that appoints counsel to defend its insured has an attorney-client relationship with that counsel. *State Farm Mut. Auto. Ins. Co. v. Fed. Ins. Co.*, 72 Cal. App. 4th 1422, 1429 (1999). And as a practical matter, that counsel often has "closer ties with the insurer than with the insured." *Id.* Therefore, an insurer cannot simply hire different counsel for two directly adverse insureds, since the insurer would still be able to control both sides of the litigation through the attorneys. *O'Morrow*, 27 Cal. 2d at 799. That rule squarely applies here because United has a duty to defend both plaintiffs and defendants in the underlying litigation.

United contends that it solved this conflict by offering separate counsel to the City and Plaintiffs and by eventually segregating their claims files. But *O'Morrow* is clear that the provision of separate counsel does not suffice. *Id.* Moreover, United did not segregate the claims files until nearly a year into the litigation; and even after its purported segregation, United provided attorney work product related to the *City's* defense to *Plaintiffs'* insurance adjuster. Thus, even if proper segregation could suffice, United failed to provide that here.

Second, there was a separate conflict of interest between United and Plaintiffs because United purported to reserve its rights to withdraw from the litigation and seek recoupment of defense costs if the alleged discharges were found to have not been "sudden." But the question of whether the discharges were "sudden" is directly at issue in the underlying litigation. And where, as here, an insurer has "reserve[d]

its rights on an issue over which [its chosen] defense counsel [would] exert[] some degree of control" in the underlying litigation, independent counsel is required. *N. Ins. Co. of N.Y. v. Allied Mut. Ins. Co.*, 955 F.2d 1353, 1359 (9th Cir. 1992). United contends that whether the releases were "sudden" is not at issue, but that is false. The timing and nature of the alleged contamination, and whether and to what extent Plaintiffs may be liable for it, are central questions to be resolved in the underlying litigation. The fact that United reserved its rights on these issues creates a clear conflict of interest.

Finally, although the District Court did not reach the issue, this Court may also affirm on the ground that United forfeited its right to control Plaintiffs' defense when it breached its duty to defend. *See Intergulf Dev. LLC v. Super. Ct*., 183 Cal. App. 4th 16, 20 (2010) (discussing forfeiture); *Olson v. Morris*, 188 F.3d 1083, 1085 (9th Cir. 1999) (Court "may affirm on any ground supported by the record.").

**III.** The District Court also correctly held that Plaintiffs did not have a duty to mitigate by accepting a supplemental defense from their excess insurer, AIG, which would have caused them further financial harm by eroding their indemnity limits. Each insurer has "a duty to defend [the action] in [its] entirety" that is "separate and independent from the other[]" insurers' obligations. *Aerojet-General Corp.*, 17 Cal. 4th at 70 (emphasis omitted). Indeed, "an excess carrier," like AIG, typically "has *no duty* to contribute . . . to the defense of the insured until the primary

24

carrier's policy limits have been exhausted." *Cont'l Cas. Co. v. Royal Ins. Co. of Am.*, 219 Cal. App. 3d 111, 118 (1990) (emphasis added).

United's contention that Plaintiffs had to mitigate the costs of United's breach by accepting AIG's supplemental defense flies in the face of settled law. The duty to mitigate requires victims of a contract breach to "do everything reasonably possible to negate [their] own loss." *Brandon & Tibbs v. George Kevorkian Acct. Corp.*, 226 Cal. App. 3d 442, 460 (1990). For example, an insured generally must "secure competent substitute counsel" to defend against the litigation when the insurer declines to provide a defense, thereby reducing the risk of an adverse judgment and any resulting liability. H. Walter Croskey et al., *Insurance Litigation* § 12:631.1 (Rutter Aug. 2023 update). But this duty does not require an insured to seek coverage of those same defense costs from another insurer. Seeking such coverage would not "negate [the insured's] own loss," but rather shift a payment obligation from one insurer to another. *Brandon*, 226 Cal. App. 3d at 460. And, here, shifting that payment obligation would have *increased* the harm suffered by Plaintiffs because accepting coverage from AIG would have eroded Plaintiffs' indemnity limits under the AIG policy. The duty to mitigate does not require Plaintiffs to take on additional, uncompensated harms for the benefit of the primary insurer that has breached its duty to defend.

**IV.** Finally, the District Court correctly ordered United to pay all past and future defense costs. Even after the District Court entered declaratory judgment in Plaintiffs' favor, United refused to pay a single cent of Plaintiffs' defense costs. The District Court therefore properly entered equitable relief, requiring United to pay. United contends that the District Court could not enter such relief because legal claims must be decided by a jury before equitable claims. But the District Court properly entered what amounted to monetary relief for Plaintiffs under its equitable powers. The Court may award monetary relief under its equitable powers when it is (1) "an attempt to give the plaintiff what he is entitled to as opposed to a substitute for a consequential loss," *Dep't of the Treasury-I.R.S. v. Fed. Labor Relations Auth.*, 521 F.3d 1148, 1155 n.4 (9th Cir. 2008), or (2) "incidental to or intertwined with injunctive relief," *Bayer v. Neiman Marcus Grp., Inc.*, 861 F.3d 853, 866 (9th Cir. 2017). Here, both are true. The District Court awarded Plaintiffs exactly what they were entitled to: payment of defense costs in accordance with their entitlement to a complete defense. And the award of backward-looking defense costs was incidental to and intertwined with the Court's prospective injunction requiring United to pay Plaintiffs' legal fees on a going-forward basis.

## ARGUMENT

## I.    THE DISTRICT COURT CORRECTLY HELD THAT PLAINTIFFS' INITIAL TENDER TRIGGERED THE DUTY TO DEFEND

"An insurer has a very broad duty to defend its insured under California law."

26

*Anthem Elecs., Inc. v. Pac. Emps. Ins. Co.*, 302 F.3d 1049, 1054 (9th Cir. 2002). That duty is triggered as soon as the insured tenders a claim that is "*potentially* covered under the policy." *Id.* (quoting *Montrose Chem. Corp. v. Super. Ct.*, 6 Cal. 4th 287, 299 (1993)). Once the insured does so, "the insurer must assume its duty to defend unless and until it can *conclusively* refute that potential" for coverage. *Id.* (quoting *Montrose*, 6 Cal. 4th at 299). "Evidence that merely place[s] in dispute whether [the insured's] actions would eventually be determined . . . to fall within one or more of the exclusions contained in the policies is insufficient to defeat the insured's right to summary judgment." *Id.* at 1060 (quoting *Montrose*, 6 Cal. 4th at 304). And "[a]ny doubt as to whether the facts establish the existence of the defense duty must be resolved in the insured's favor." *Id.* (citation omitted).

On appeal, United improperly attempts to shift the burden to prove coverage onto Plaintiffs. But California courts uniformly recognize that once an insured has satisfied its initial burden of tendering a complaint with the *potential* for coverage, an insurer cannot disclaim its duty to defend merely by pointing to a lack of magic words in the complaint. Instead, the insurer must "conclusively refute that potential" by showing that the claim *cannot* fall within the policy. *Montrose*, 6 Cal. 4th at 299 (citation omitted). The District Court's sound decision should be affirmed.

27

**A.    The District Court Correctly Held That Plaintiffs' Initial Tender Triggered A Duty To Defend, Which United Failed To Conclusively Refute**

The District Court correctly held that LAT's initial May 2018 tender of the City's state court complaint established United's duty to defend.[4]  As the California Supreme Court has explained, an insurer's duty to defend arises as soon as the insured tenders a claim where "the underlying complaint" either "alleges the insured's liability for damages *potentially* covered under the policy" or "might be amended to give rise to a liability that would be covered under the policy."  *Montrose*, 6 Cal. 4th at 299.  Of course, an insured cannot demonstrate a potential for coverage by wildly "speculating" about facts and theories that have no grounding in the complaint, *Los Angeles Lakers, Inc. v. Federal Ins. Co.*, 869 F.3d 795, 805 (9th Cir. 2017), but so long as coverage can be "reasonably infer[red]" from the complaint, the insured has met its burden, *Scottsdale Ins. Co. v. MV Transp.*, 36 Cal. 4th 643, 654 (2005).

Here, the District Court reasoned that the "sudden and accidental" nature of the discharges could be "'reasonably infer[red]'" from the City's allegations that "LAT was negligent in handling hazardous substances and chemicals."  1-ER-21–22 (quoting *Scottsdale Ins. Co.*, 36 Cal. 4th at 654).  After all, negligent handling

---

[4]    This section refers to "LAT" because on the date of the initial tender, Soco was not yet a party to the action.  3-ER-406–07.

and storage can give rise to "sudden and accidental" discharges, which the insured never intended or expected. The District Court further reasoned that "'the complaint could fairly be amended to state a covered liability.'" 1-ER-21 (citation omitted). Indeed, the City subsequently *did amend* its complaint to state a covered liability, alleging that the "contamination occurred 'suddenly and accidentally.'" 1-ER-15 (citation omitted).

Once that duty was triggered, the District Court correctly held that United could not "conclusively refute th[e] potential" for coverage simply by pointing to a lack of magic words in the complaint. *Montrose*, 6 Cal. 4th at 299 (citation omitted). United told Plaintiffs it was disclaiming coverage because "the complaint does not allege that any of these discharges, dispersals, releases or escapes were 'sudden and accidental.'" 3-ER-379 (letter from United); *see also* SER-27 (Hoffman Depo. 152:22–25) (Hoffman explaining that United disclaimed coverage solely because of "the way the pleadings were pled"). But as the District Court recognized, the potential "sudden and accidental" nature of the discharges could be readily inferred from the complaint's allegations. The fact that the complaint does not use the magic words "sudden and accidental" does not matter. "California law is clear that an insurer 'cannot construct a formal fortress of the third party's pleadings and retreat behind its walls." 1-ER-22 (quoting *Gray v. Zurich Ins. Co.*, 65 Cal. 2d 263, 276 (1966)).

For example, in *Anthem Electronics*, this Court held that an insurer had a duty to defend where the policy covered "damages . . . incurred to third parties for loss of use of property," even though the complaint "did not mention loss of use of [property]." 302 F.3d at 1058. Because the complaint alleged that the insured's products were defective and that those products were installed in the third-party's systems, the complaint "raise[d] [the] obvious inference that [the third party] lost the use of its systems because of [the insured's] defective products." *Id.* Although the complaint did not use the precise words of the insurance policy, coverage could be readily inferred and the complaint could easily have been amended to use the specific words of the insurance policy. Thus, the insured had established a potential for coverage, which the insurer could not defeat simply by pointing to the absence of a talismanic phrase. *Id.* The same is true here.[5]

The District Court also correctly rejected United's argument that the pollution could not be "sudden" because it had allegedly "occurred over decades." 1-ER-22. As an initial matter, the mere fact that Plaintiffs operated at the site for decades does not mean that the alleged pollution "occurred over decades." Moreover, as the District Court explained, "allegations of historic pollution do not foreclose the

---

[5] "California courts have repeatedly found that [even] remote facts buried within causes of action that may potentially give rise to coverage are sufficient to invoke the defense duty." *Pension Tr. Fund for Operating Eng'rs v. Fed. Ins. Co.*, 307 F.3d 944, 951 (9th Cir. 2002). Here, we have far more than "remote facts." *Id.*

possibility that the alleged property damage was caused, at least in part, by a sudden release of contaminants." 1-ER-41; *see* 1-ER-22. "[S]udden" releases may "continue unabated for some period because of a negligent failure to discover it, technical problems or a lack of resources that delay curtailment, or some other circumstance." *Vann v. Travelers Cos.*, 39 Cal. App. 4th 1610, 1617 (1995) (quoting *Shell Oil Co. v. Winterthur Swiss Ins. Co.*, 12 Cal. App. 4th 715, 756 (1993)). Thus, the mere suggestion that some pollution may have occurred over decades does not foreclose the possibility that the initial discharge or discharges were "sudden" and "accidental." *See id.* at 1615-18 (holding that contamination occurring over "thirty-eight years" could be "sudden and accidental"); *see also Staefa Control-System Inc. v. St. Paul Fire & Marine Ins. Co.*, 847 F. Supp. 1460, 1469 (N.D. Cal. 1994) ("sudden accident exception applies if there is *any* possibility that the gradual migration of pollutants . . . was caused by a sudden accident" (emphasis altered)).[6]

In short, United comes nowhere close to showing that there was "no conceivable theory" under which coverage could exist. *Anthem Elecs.*, 302 F.3d at 1056 (emphasis and citation omitted). To the contrary, the allegations in the

---

[6] As the District Court explained, "[i]f anything, whether hazardous materials were suddenly or accidentally discharged during Plaintiffs' operations at the Sliver Site are factual questions that support a finding of a duty to defend." 1-ER-41.

complaint clearly encompassed the potential for liability based on sudden and accidental discharges—as the City's subsequent amendment underscored.

### B.    United Misstates The Relevant Burdens

United contends that because Plaintiffs have the initial burden of establishing a "potential" for coverage, if the underlying complaint does not use the precise phrase "sudden and accidental," then Plaintiffs must "share extrinsic evidence" proving that the discharges were sudden and accidental.  Br. 47.  That is plainly incorrect.  As explained above, Plaintiffs need only show that a potential for coverage can be "reasonably infer[red]" from the complaint, *Scottsdale Ins. Co*., 36 Cal. 4th at 654, or that the complaint "might be amended to give rise to a liability that would be covered under the policy," *Montrose*, 6 Cal. 4th at 299 (citation omitted).  Once Plaintiffs have made that showing, the duty to defend applies "unless and until" the insurer "can conclusively refute that potential" for coverage.  *Id.* (citation omitted).  "In other words, the insured need only show that the underlying claim *may* fall within the policy coverage; the insurer must prove it *cannot.*"  *Id.* at 300.  This "disparity" in the parties' respective burdens is "necessary to afford the insured what it is entitled to: the full protection of a defense on its behalf."  *Id.* at 300, 295.

United's efforts to place on Plaintiffs the burden to investigate and produce extrinsic evidence proving that the discharges were sudden and accidental flout this

longstanding precedent. *See, e.g.*, *Anthem Elec.*, 302 F.3d at 1054 ("*insurer* must undertake a reasonable investigation . . . before denying coverage" (emphasis added)). Moreover, if the insured were responsible for producing evidence that the alleged pollution was, in fact, caused by sudden and accidental discharges, that would prevent an insured who *did not cause* the pollution and had no knowledge of its occurrence from ever being entitled to a defense. That cannot be correct.

In support of its contrary argument, United relies primarily on *Sony Computer Entertainment America, Inc. v. American Home Assurance Co.*, 532 F.3d 1007 (9th Cir. 2008), but that case is far afield. Sony had tendered defense of a class action suit alleging that the PlayStation 2 suffered from design defects to its insurer. *Id.* at 1010-11. Sony's insurance policy covered suits alleging the "loss of use of [non-Sony] property." *Id.* at 1018. But it excluded losses caused by a "'defect, deficiency, inadequacy, or dangerous condition in "[Sony's] product,"'" unless those losses arose "'out of a sudden and accidental physical injury'" to Sony's product. *Id.* (quoting policy). Sony argued that there was a potential for coverage because its product, the PlayStation 2, could have damaged non-Sony property, game discs, causing them to be unusable. *Id.* at 1018-19. Sony further argued that such a loss could have arisen out of a sudden and accidental injury to each class member's PlayStation 2. *Id.* at 1019-20. The Court rejected both arguments. The Court emphasized that *no* allegations suggested the game discs "did not function properly

33

on other devices," making the case distinguishable from cases "in which the insured's defective property rendered the property of a third party unusable," such as *Anthem Electronics*. *Id.* at 1019. The Court further stated that it was not possible to infer that "every class member's devices experienced a sudden and accidental physical injury" from the allegations in the complaint. *Id.* at 1019-20. Therefore, Sony had not raised even the "potential" for coverage.

By contrast, here, the City's complaint raises a clear potential for coverage because the allegations support the possibility that the commencement of the discharges could have been sudden and accidental, in whole or in part. 1-ER-22. Thus, Plaintiffs have met their initial burden and triggered the duty to defend. *Sony* does not stand for the proposition that *in addition* to tendering a complaint with the potential for coverage, an insured must supply extrinsic facts showing that coverage is, *in fact*, warranted. (And if *Sony* did stand for that proposition, it would be inconsistent with numerous California cases, including a decision of the California Supreme Court, which place the burden to conclusively refute coverage squarely on the insurer. *See supra* at 26-32; *see also Gray*, 65 Cal. 2d at 276 ("[C]ourts do not examine only the pleaded word but the potential liability created by the suit."); *Scottsdale Ins. Co.*, 36 Cal. 4th at 655 (duty to defend is not extinguished "until the insurer negates all facts suggesting potential coverage").)

Instead, *Sony* stands for a far more basic proposition: an insured seeking to establish a "potential" for coverage cannot demonstrate such potential through wild "speculat[ion]" about different facts and theories of liability that have no grounding in the complaint as written and as tendered to the insurer. *Los Angeles Lakers*, 869 F.3d at 805 (citation omitted). In *Sony*, the Court found no potential for coverage because there were no facts in the complaint even remotely supportive of the implausible theory that Sony posited.

United's other cases all stand for essentially the same proposition. In *All Green Electric, Inc. v. Security National Insurance Co.*, for example, the plaintiff sued the insured for failure to properly install a bolt in an electrical cabinet. 22 Cal. App. 5th 407, 410, 413-18 (2018). The insurance policy at issue did not cover negligent installation. *Id.* The court held that the insured could not show a "potential" for coverage merely by hypothesizing about fantastical facts that might disprove its negligence. *Id.* at 413-18. That "a truck could have hit the electrical cabinet, or vandals or an earthquake could have damaged it," did not show a potential for coverage under the complaint, which solely alleged poor installation by the insured. *Id.* at 413-14.

United's other cases apply the same reasoning. *See, e.g.*, *Los Angeles Lakers*, 869 F.3d at 806 (complaint brought only invasion of privacy claim, which was not covered by insurance policy, and insured "ha[d] not identified [any] other claim this

35

set of facts could support"); *Olympic Club v. Those Interested Underwriters at Lloyd's London*, 991 F.2d 497, 501-03 (9th Cir. 1993) (complaint brought claims against the Club for discriminatory Club policies, not claims "based on the wrongful act of a director, officer or employee imputed to the Club as principal," which were the only claims covered by the policy). In short, these cases hold only that the insured cannot establish a potential for coverage by rewriting the complaint to bring fundamentally different claims against fundamentally different parties under fundamentally different and fantastical facts.

Those cases do not apply here. The City's complaint tendered to United in May 2018 alleged that LAT was negligent in its storing and handling of hazardous chemicals, 3-ER-416–18 (¶¶ 31, 38), which plainly raised the possibility that releases of those chemicals were "sudden and accidental." And indeed, the City later amended its own complaint to so state, reinforcing the potential for coverage from the outset. Thus, contrary to the cases on which United relies, Plaintiffs had no need to hypothesize about a fundamentally different case to show a potential for coverage: they could show it through the existing allegations and the fact that the related state counterclaims and federal litigation all alleged, from their inception, potential "sudden and accidental" releases arising out of the same events.

Finally, United's cases "applying the pollution exclusion," Br. 47, are distinguishable for a similar reason. In each, the complaint alleged that the insured's

36

regular and sole business practice involved improperly disposing of hazardous waste, which is fundamentally inconsistent with the possibility that the discharges were "accidental." For example, in *American States Insurance Co. v. Sacramento Plating, Inc.*, it was undisputed that the insured regularly "splash[ed], spill[ed], and dripp[ed]" chemicals on the floor "during the regular course of the facility's operation." 861 F. Supp. 964, 971 (E.D. Cal. 1994), *aff'd*, 99 F.3d 1145 (9th Cir. 1996); *see also A-H Plating, Inc. v. Am. Nat'l Fire Ins. Co.*, 57 Cal. App. 4th 427, 441 n.11 (1997) (agreeing that exception for "sudden and accidental" pollution does not apply where the insured is alleged to have "pollute[d] . . . as part of its regular business practice by repeatedly discharging contaminants in the same manner on a daily basis over several years").[7] Here, nothing in the complaint excluded the possibility of "sudden and accidental" contamination—as the City's amendments to the complaint confirmed.

Ultimately, United's entire argument on appeal is just an effort to shift its burden to conclusively *disprove* coverage onto Plaintiffs to conclusively *prove*

---

[7] United also ignores that later cases have criticized *Sacramento Plating* for failing to even "mention the 'potential for liability' standard used in duty to defend cases," *Arrowood Indem. Co. v. Bel Air Mart*, No. 2:11-cv-976, 2014 WL 841314, at *5 (E.D. Cal. Mar. 4, 2014), and for requiring the insured to "establish that it actually contaminated the property," which is "contrary to the principles established in *Montrose*," *A-H Plating, Inc.*, 57 Cal. App. 4th at 443.

coverage. That is simply not the law. The District Court's decision should be affirmed.

## II. THE DISTRICT COURT CORRECLTY HELD THAT PLAINTIFFS ARE ENTITLED TO INDEPENDENT COUNSEL

The District Court likewise correctly held that Plaintiffs were and are entitled to independent counsel on two grounds. First, there is a conflict between Plaintiffs and the City as direct adversaries in the litigation who both claimed a defense from United under the same insurance policies. That conflict was rendered all the more obvious by United's sharing of attorney work product between supposedly separate insurance adjusters for Plaintiffs and the City. Second, United's reservation of rights creates an additional conflict between United and Plaintiffs because United's appointed counsel would have had the opportunity to "control the outcome of the very issue on which United ha[d] reserved its right to withdraw Plaintiffs' defense," *i.e.*, whether the Qualified Pollution Exclusion applied. 1-ER-23–27. Finally, although the District Court did not reach Plaintiffs' argument that United forfeited its right to control the defense and appoint its preferred counsel when it breached its duty to defend, 1-ER-24, this Court "may affirm on any ground supported by the record." *Olson v. Morris*, 188 F.3d 1083, 1085 (9th Cir. 1999).

38

**A.      California Law Requires Independent Counsel Where There Is A Conflict Of Interest Between The Insurer and The Insured**

Under California Civil Code section 2860(a), where an insurer has a duty to defend "and a conflict of interest arises" between the insurer and the insured, the insurer has a "duty . . . to provide independent counsel." Cal. Civ. Code § 2860(a). Independent counsel is counsel "selected by the insured," rather than the insurer, whose costs the insurer must reimburse. *Previews, Inc. v. Cal. Union Ins. Co*., 640 F.2d 1026, 1028 (9th Cir. 1981). This is known as *Cumis* counsel. *See San Diego Navy Fed. Credit Union v. Cumis Ins. Soc'y, Inc*., 162 Cal. App. 3d 358 (1984).

This rule is rooted in a recognition of the "dual attorney-client relationship" that exists in insurance matters: Although the attorney represents the insured, she is retained by the insurer, who "control[s] the defense [the insured] provides." *State Farm Mut. Auto. Ins. Co. v. Fed. Ins. Co*., 72 Cal. App. 4th 1422, 1429 (1999). The insurer is treated as a separate client of the attorney, and as a practical matter, the attorney will often "have closer ties with the insurer than with the insured." *Id.* Accordingly, when a conflict of interest arises, the insured must be given the option to select its own counsel, who is not controlled by the insurer.

**B.      It Is A Conflict Of Interest For United To Retain Counsel For Adversary-Insureds In The Same Litigation**

One paradigmatic example of a conflict of interest requiring independent counsel is where the insurer has a duty to defend directly adverse parties in the same

39

underlying litigation. *See, e.g.*, *O'Morrow v. Borad*, 27 Cal. 2d 794, 799 (1946) (requiring independent counsel where insurer represented plaintiff and defendant in car crash). "It is contrary to public policy for a person to control both sides of litigation." *Id.* at 798. And because an insurer has an independent attorney-client relationship with the insured's counsel, this problem cannot be resolved by "retain[ing] different counsel for each policyholder," since the insurer would still "have access to all information in regard to the entire case" through the policyholders' "respective attorneys" and would be able to control the litigation in ways that do not (and necessarily cannot) align with both insureds' interests. *Id.*

It should thus come as no surprise that "[t]here is a large block of authority recognizing what also seems relatively obvious: when an insurer is obligated to provide defenses for two or more insureds with adverse interests, there is a sufficient conflict of interests that the insurer must provide independent counsel for each insured at its own expense." Jordan R. Plitt et al., *Couch on Insurance* § 202:25 (3d ed. June 2024 update). Such a conflict creates a risk that the insured will attempt to control the litigation in a way that is adverse to an insured's interests, such as by "stall[ing] the insured victim until the statute of limitations ha[s] run" or directing an early, low-value settlement in an attempt to minimize its own costs. *Id.* § 202:25 n.2. In addition, the conflict "also affects the [insured's] duty to cooperate" with its insurer in its own defense, because strict enforcement of such a duty "could result in

insureds disadvantaging themselves by supplying information which the insurer could use to its own benefit and to the insureds' detriment." *Id.* § 202:25.

Here, United's agreement to defend direct adversaries "each seeking to find the other liable for all or part of the alleged contamination" in the same action created an "obvious" conflict of interest requiring independent counsel. 1-ER-23–25. As the District Court explained, this conflict of interest is identical "to the circumstances addressed in *O'Morrow*." 1-ER-45; *see* 1-ER-24–25. In *O'Morrow*, the California Supreme Court held that it was a conflict of interest for an insurance company to control the defenses of two adverse policyholders—the plaintiff and the defendant in a lawsuit arising out of a car crash—because "a full and fair judicial examination of the merits of a case cannot be had when one person controls counsel for both sides." 27 Cal. 2d at 799. Just as in *O'Morrow*, United would have the ability to control the defenses of two adversaries, with the incentive to minimize its own costs.

United strives to portray *O'Morrow* as a product of a bygone legal era, Br. 55-57, but United ignores the "'large block of authority'" in California and elsewhere agreeing with *O'Morrow*'s rule. 1-ER-44 (quoting *Centex Homes v. St. Paul Fire & Marine Ins. Co.*, 237 Cal. App. 4th 23, 28 (2015)). Contrary to United's assertions, the "key" to *O'Morrow*'s holding was not California's former standard for "contributory negligence," Br. 55, but the fundamental principle that "[i]t is contrary to public policy for a person to control both sides of litigation," 27 Cal. 2d at 798.

41

Indeed, several recent cases cite *O'Morrow* for exactly that principle. *See, e.g.*, *Centex Homes v. St. Paul Fire & Marine Ins. Co.*, 19 Cal. App. 5th 789, 803 (2018) (*O'Morrow* held that the insurer may "not control both sides of litigation"); *James 3 Corp. v. Truck Ins. Exch.*, 91 Cal. App. 4th 1093, 1101 (2001) (*O'Morrow* requires independent counsel "where the insurer insures both plaintiff and the defendant"). Far from a legal relic, *O'Morrow* embodies an obvious and longstanding principle: "when an insurer is obligated to provide defenses for two or more insureds with adverse interests," it cannot simply "provide different counsel" and call it a day. *Couch on Insurance* § 202:25.

United argues that under *Federal Insurance Co. v. MBL, Inc.*, 219 Cal. App. 4th 29 (2013), an insurer may avoid the independent counsel requirement by "retain[ing] different law firms" and "assign[ing] different claims adjusters." Br. 57. That is wrong. *O'Morrow* specifically rejected the insurers' argument that they could "retain different counsel for each policyholder," because this would not eliminate the issue of the insurance companies controlling both sides of the litigation. 27 Cal. 2d at 798. As a California Court of Appeal case, *MBL* cannot override that determination of the California Supreme Court. And unsurprisingly, *MBL* did not purport to do so. In *MBL*, the insurers "*did not . . . insure both sides of the litigation*." 219 Cal. App. 4th at 46 (emphasis added). Unlike in *O'Morrow* and this case, the policyholders in *MBL* were both third-party defendants and "there [was] *no evidence*

of any adversarial litigation activity" between them that "could have created a conflict of interest." *Id.* (emphasis added). Thus, *MBL* says nothing about whether segregation is appropriate where, as here, the insureds are on opposite sides of the v.

United's failed attempt to segregate the City's and Plaintiffs' claims for defense by separate counsel only underscores why such segregation cannot suffice. As the District Court found, "at least six months passed after United accepted the City's defense before United finally segregated the [claims] file," and a "single claims handler, Randi Hoffman, handled the unified file" until that point. 1-ER-25. Even after United purportedly segregated the claims, Hoffman "sent the 'master files'—including an attorney's claims assessment report—to both new adjusters." *Id*. Although United now contends that "[c]ommunications were completely closed" between the new insurance adjusters after the claims were segregated, Br. 58, the undisputed evidence reveals the opposite: Hoffman *invited* one of the new adjusters to read attorney work product pertaining to the other side's claims *after* purportedly segregating those claims. 2-ER-210 (Hoffman stating she "left [the report] there so you [i.e., the new adjuster] could get a sense of what's going on since you['re] brand new to the claim."). That United was unable to successfully separate the City's and Plaintiffs' defense materials just goes to show why California courts uniformly dictate the availability of separate independent counsel and have not allowed insurers to resolve conflicts of interest by purportedly separating claims files.

43

## C.    United's Reservation Of Rights Created A Conflict Of Interest

Plaintiffs are likewise entitled to their own counsel for a second, independent reason: United's reservation of rights under the Qualified Pollution Exclusion created a direct conflict of interest between United and Plaintiffs regarding the subject-matter of the litigation.  1-ER-26–27.  Independent counsel is required where there is a reservation of rights "and the outcome of that coverage issue can be controlled by counsel first retained by the insurer for the defense of the claim."  Cal. Civ. Code § 2860(b); *see N. Ins. Co. of N.Y. v. Allied Mut. Ins. Co.*, 955 F.2d 1353, 1359 (9th Cir. 1992).  In other words, there is a conflict of interest whenever an insurer has "reserve[d] its rights on an issue over which [its chosen] defense counsel exerts some degree of control."  *N. Ins.*, 955 F.2d at 1359.

This rule is again rooted in the "dual attorney-client relationship" with the insurer and insured.  *State Farm*, 72 Cal. App. 4th at 1429.  Where there is a conflict between the insurer and insured regarding coverage and the outcome of that dispute can be impacted by the underlying litigation, counsel for both would be forced to "walk an ethical tightrope," declining to "communicate relevant information which is beneficial to one or the other of his clients" regarding coverage.  *Cumis*, 162 Cal. App. 3d at 366.  In such circumstances, the insurer must provide independent counsel.

Here, United reserved "the right to disclaim indemnity and the right to withdraw from defending [Plaintiffs] should it be discovered that no 'sudden and

44

accidental' releases did, in fact, occur." 2-ER-337; 2-ER-342. This reservation of rights included "the right to seek reimbursement or recoupment from [Plaintiffs] of any sums expended in [Plaintiffs'] defense or settlement," and a "right to withdraw from [Plaintiffs'] defense," if the litigation demonstrated that the underlying action fell within the Qualified Pollution Exclusion. *Id.*

The District Court correctly concluded that this reservation would give United the incentive to direct a more vigorous defense against a liability theory based on "ongoing, deliberate pollution (which precludes Plaintiffs' coverage) versus sudden, unexpected contamination (which provides Plaintiffs' coverage)." 1-ER-26–27. After all, if Plaintiffs were found liable based on a negligence theory premised on non-"sudden" pollution, United could attempt to invoke its reservation of rights and "seek reimbursement or recoupment from [Plaintiffs] of any sums expended in [Plaintiffs'] defense or settlement." 2-ER-337; 2-ER-342. That is a clear conflict of interest, which carried the potential to shape the course of the litigation.

United claims there is no conflict because it reserved the right to disclaim indemnity only for "'sudden' releases, while waiving any reservation as to 'accidental' releases." Br. 59 (citing 2-ER-337; 2-ER-342). In United's telling, the former has "'nothing to do with the issues being litigated in the underlying action'"

because it "'relates only to the timing of the damages.'"  *Id.* at 59-60 (citations omitted).  That is wrong for at least two reasons.[8]

First, "timing" is at issue in the underlying suit.  For example, LAT alleges that the contamination was caused not by its operations but by those of other responsible parties, including former tenant Occidental's operations, which occurred *before* LAT took over the site.  *See, e.g.*, 3-ER-389.  But counsel provided by United would not necessarily have an interest in establishing the other parties' fault, as United could seek to escape indemnity liability altogether by having its appointed counsel manipulate the litigation in a way that establishes that *Plaintiffs* caused the contamination through *non-sudden* releases.

Second, and in any event, the "sudden" nature of the discharges relates not just to their "timing," but to the *nature* and *extent* of the alleged negligence.  Whether the commencement of the discharges was "sudden" or not may shape conclusions about the amount of contamination and the extent to which third parties other than Plaintiffs exacerbated it.  *Cf. Shell Oil*, 12 Cal. App. 4th at 756 (sudden releases may "continue unabated for some period" because of circumstances that "delay

---

[8]    Moreover, exclusionary phrases are not to be confined to their component parts. *See, e.g.*, *MacKinnon v. Truck Ins. Exch.*, 31 Cal. 4th 635, 652 (2003) (citation and quotation omitted).   The potential application of the Qualified Pollution Exclusion in full creates the conflict of interest, not the isolated "sudden" quality of the alleged release. *See James 3 Corp.*, 91 Cal. App. 4th at 1108.

curtailment," which may or may not be within the insured's control). For example, two alternate theories of liability could be offered by the City—one that involves "sudden and accidental" releases, and one that does not. Defense counsel retained by United could decide to more vigorously defend against the "sudden and accidental" theory, while having every incentive (due to United's reservation of rights) to agree with the alternative characterization and develop facts consistent with it, even though that would likely result in greater liability for Plaintiffs. That is as clear a conflict of interest as it gets and explains why, under longstanding precedent, United could not select and control Plaintiffs' counsel. *See, e.g.*, *Cumis*, 162 Cal. App. 3d at 369 (insurer must pay for independent counsel where "multiple theories of recovery" are at issue and "some theories involve uncovered conduct").

Although United again seeks to analogize to *MBL*, this case stands in sharp contrast. In *MBL*, there was no conflict of interest when multiple insurers reserved rights "for damages occurring outside their various policy periods," because the timing simply was "not . . . relevant" where the insurers' policies taken together covered the entire period at issue. 219 Cal. App. 4th at 47. By contrast, here, the nature and extent of the releases is one of the key issues in the case, and United's counsel would have the power to develop a record that precludes coverage.

United's other cases are similarly distinguishable. In *Hollyway Cleaners & Laundry Co. v. Central National Insurance Co. of Omaha, Inc.*, the question of

"whether or not Plaintiffs intentionally cause[d] the chemical spills" was "immaterial to the Underlying Action, because the pleadings in the Underlying Action do not restrict the[] causes of action to deliberate or intentional acts." 219 F. Supp. 3d 996, 1006 (C.D. Cal. 2016). Therefore, counsel would have no opportunity to "manipulate the defense . . . to result in a finding that the chemical spills were intentional," thus denying coverage. *Id.* Likewise, in *Sempra Energy v. Associated Electric & Gas Insurance Services Ltd*., there was no conflict because "the reservation [was] unrelated to the merits of the underlying action." 473 F. Supp. 3d 1052, 1065 (C.D. Cal. 2020). The insurer reserved the right to assert that the complaint did not concern contamination that occurred within the time period covered by the policies. *Id.* As the court explained, the "[u]nderlying [l]awsuits do not succeed or fail based on the time period of the claim." *Id.* By contrast, as explained above, the timing, nature, and extent of the releases is at issue in the underlying litigation and United can control the development of that issue through its chosen counsel. Thus, it is hardly surprising that the same district court judge who found no conflict in *Sempra Energy* and *Hollyway Cleaners* found one here.

### D. United Breached Its Defense Obligations And Therefore Forfeited Its Right To Control Plaintiffs' Defense

The district court did not reach Plaintiffs' third argument: United forfeited its right to control the defense and appoint counsel because it breached its duty to

defend upon LAT's initial tender. 1-ER-24. But this Court can and should affirm on this additional, independent basis. *See Olson*, 188 F.3d at 1085.

When an insurer breaches its duty to defend, the insurer "forfeit[s] . . . the right to control defense of the action or settlement, including the ability to take advantage of the protections and limitations set forth in section 2860." *Intergulf Dev. LLC v. Super. Ct.*, 183 Cal. App. 4th 16, 20 (2010); *see also Eigner v. Worthington*, 57 Cal. App. 4th 188, 196 (1997) (same). United's refusal to defend upon tender of the state court action therefore resulted in its forfeiture of control over Plaintiffs' defense.

United's later hollow acknowledgment of its duty cannot cure that breach. *See Shade Foods, Inc. v. Innovative Prods. Sales & Mktg., Inc.*, 78 Cal. App. 4th 847, 881 (2000) ("[A] belated offer to pay the costs of defense may mitigate damages but will not cure the initial breach of duty."). Indeed, United refused to pay previously incurred defense expenses, withheld independent counsel, and failed to reimburse any amount incurred, only further cementing its breach. 1-ER-11.

Plaintiffs were therefore entitled to continued representation by their independent counsel, which they had come to rely upon precisely *because* United refused to honor its duty to defend. This supplies yet another basis to affirm.

49

## III.   THE DISTRICT COURT CORRECLTY HELD THAT PLAINTIFFS DID NOT FAIL TO MITIGATE THE COST OF UNITED'S BREACH

United contends that Plaintiffs "unreasonably failed to mitigate" by declining an offer of defense from their excess insurer, AIG.  Br. 63.  A "plaintiff who suffers damage as a result of either a breach of contract or a tort has a duty to take reasonable steps to mitigate those damages and will not be able to recover for any losses which could have been thus avoided."  *Shaffer v. Debbas*, 17 Cal. App. 4th 33, 41 (1993).  United argues that this duty required Plaintiffs to accept a supplemental defense from AIG, even though doing so would have further harmed Plaintiffs by eroding their excess policy limits.  That contention finds no support in the case law.  The duty to mitigate does not require the party harmed by the defendant's breach of contract to voluntarily increase *its own harms*, simply to reduce the payment that *the breacher* owes.  Moreover, California law is clear that United cannot avoid its duty to defend simply by identifying another insurer who might have covered some or all of Plaintiffs' defense costs at the expense of Plaintiffs' overall indemnity coverage.

United's argument is premised on a fundamental misunderstanding of the duty to mitigate.  That duty requires plaintiffs to "do everything reasonably possible to negate [their] *own* loss."  *Brandon & Tibbs v. George Kevorkian Acct. Corp.*, 226 Cal. App. 3d 442, 460 (Ct. App. 1990) (emphasis added).  The purpose of this duty is to encourage victims of contractual breaches to take steps to minimize the harm that they suffer from the breach, not to require victims to accept *additional*,

*uncompensated* harms solely to minimize the breacher's damages. In the insurance context for a duty to defend, the duty to mitigate generally means "secur[ing] competent substitute counsel" to defend against the litigation, thereby reducing the risk of an adverse judgment and any resulting liability. H. Walter Croskey et al., *Insurance Litigation* § 12:631.1 (Rutter Aug. 2023 update). It does *not* mean seeking coverage of those defense costs from another insurer. That is because seeking such coverage would not "negate [the insured's] own loss." *Brandon*, 226 Cal. App. 3d at 460. At best, it would simply change who is paying for that loss. And at worst, as here, it would actually *increase* the insured's loss because accepting coverage from AIG would have eroded Plaintiffs' excess indemnity limits.

United's contrary argument fundamentally undercuts the duty to defend. California case law is clear that each insurer has "a duty to defend [the action] in [its] entirety" that is "separate and independent from the other[]" insurers' obligations. *Aerojet-General Corp. v. Transp. Indem. Co*., 17 Cal. 4th 38, 70 (1997) (emphasis omitted). "The fact that one insurer may owe a duty to provide a defense will not excuse a second insurer's failure to honor its separate and independent contractual obligation to defend." *Emerald Bay Cmty. Ass'n v. Golden Eagle Ins. Corp.*, 130 Cal. App. 4th 1078, 1088 (2005) (citations omitted). That is all the more true in the context of a primary insurer, like United, and an excess insurer, like AIG. "[A]n excess carrier has *no duty* to contribute to a settlement or to the defense of the insured

51

until the primary carrier's policy limits have been exhausted." *Cont'l Cas. Co. v. Royal Ins. Co.*, 219 Cal. App. 3d 111, 118 (1990) (emphasis added). That is why, although AIG offered to finance the defense (up to its policy limits), it emphasized that it had no obligation to do so "until and unless it is shown that [United] . . . has no obligation to provide a defense." 2-ER-327. Indeed, AIG "reserve[d] the right to terminate the defense if [United] agree[d] to provide a defense." 2-ER-328. United cannot now rely on any purported defense that AIG might have provided to excuse its own failure to comply with its court-ordered duty to defend.

Here, Plaintiffs properly pursued United for its complete duty to defend because accepting AIG's supplemental defense would have not reduced Plaintiffs' *own* defense costs. Indeed, accepting AIG's offer would have imposed a *larger* cost on Plaintiffs (by eroding their excess indemnity limits), further justifying Plaintiffs' denial of the offer. As the "innocent party," Plaintiffs need not "surrender important and valuable rights," including their ability to access their excess insurance, merely to "reduce" the breacher's "liability." *Seaboard Music Co. v. Germano*, 24 Cal. App. 3d 618, 623 (1972). Because accepting AIG's offer of defense would not have reduced the total defense costs, and indeed would have further harmed Plaintiffs, Plaintiffs were not required to accept that defense.

The sole insurance case United cites does not support its inequitable position. In *Emerald Bay*, the court held that the plaintiff-insured had suffered no harm

because all of its defense costs had been paid, either by the defendant-insurer or its excess insurer. 130 Cal. App. 4th at 1089. The court concluded that the plaintiff-insured could not therefore recover additional funds from its primary insurer because that would constitute double recovery, in excess of the insured's actual defense costs. *Id.* at 1090. To the extent that the excess insurer may have had a claim against the primary insurer to apportion the costs consistent with the policies' terms, the excess insurer had to bring that suit. *Id.* at 1092. *Emerald Bay* does not remotely stand for the extraordinary proposition that the insured must accept coverage from its declining-limits excess insurer as part of its obligation to "mitigate" the primary insurer's liability for defense costs under non-declining-limits primary policies.[9]

## IV. THE DISTRICT COURT CORRECTLY ORDERED UNITED TO PAY DEFENSE COSTS IN FULL

Finally, the District Court was well within its authority to order United to pay Plaintiffs' defense costs in full. 1-ER-5–12. Even after the District Court entered summary judgment, United refused to pay *any* defense costs—even the portion of past costs it did not dispute it owed. But United's duty to defend is a special contemporaneous duty under California law, where the "[i]mposition of an

---

[9] As a last ditch effort, United briefly contends that whether Plaintiffs should have accepted coverage from AIG is "'a question of fact'" that precluded summary judgment. Br. 64 (citation omitted). But the facts are "undisputed," as United concedes. *Id.* The only question is whether AIG's supplemental defense implicates the duty to mitigate as a matter of law, which it does not.

immediate duty to defend is necessary to afford the insured what it is entitled to: the full protection of a defense on its behalf." *Montrose*, 6 Cal. 4th at 295; *Buss v. Super. Ct.*, 16 Cal. 4th 35, 49 (1997) ("To defend meaningfully, the insurer must defend immediately. To defend immediately, it must defend entirely." (citation omitted)).

Therefore to enforce this immediate duty, and "[i]n the face of United's intransigence, the Court [found] it necessary to exercise its equitable authority to effectuate its prior rulings" by ordering "United to immediately pay Plaintiffs' defense costs, in full," including as "costs are incurred on a going-forward basis." 1-ER-11–12. The District Court reasoned that "[p]ayment in full [was] justified based on the 'presumption' that arises when an insured has been 'le[ft] . . . to mount his own defense or suffer a default,' that 'the amount of . . . defense costs was reasonable.'" 1-ER-11 (alterations in original) (citation omitted).[10]

On appeal, United contends that the District Court lacked authority to enter such an order because "[w]hen a case involves both legal and equitable claims, the Seventh Amendment requires legal claims to be tried to a jury first." Br. 65 (emphasis omitted). But all of the relief the District Court ordered was equitable. The portion of the order requiring United to pay defense costs going forward, "as

---

[10] Plaintiffs provided all defense invoices at issue in Court-ordered supplemental briefing. *See* 3-ER-594–95 (Dkts. 130, 131, 132, 133, 140, 141, 142); SER-9–22. Prior to that briefing, United failed to dispute these costs at any point despite receiving regular invoices. SER-21.

they were incurred," is plainly equitable, as this Court has previously held. *Gon v. First State Ins. Co.*, 871 F.2d 863, 864-66 (9th Cir. 1989) (order directing insurer "to pay defense expenses in the [underlying] litigation as they were incurred . . . [meets] the general definition of an injunction"). And the portion of the order requiring United to pay defense costs on a backward-looking basis, which were already incurred, is equitable too. United does not appear to dispute that the forward-looking relief the District Court entered is equitable in nature but contends that the backward-looking relief is not. That is wrong. As explained below, both are equitable.

"In determining whether a requested remedy constitutes equitable relief," the Court looks "to the substance or character of the remedy sought, not the label placed upon it." *Bayer v. Neiman Marcus Grp., Inc.*, 861 F.3d 853, 863 (9th Cir. 2017). "A monetary award can be either legal or equitable in nature." *Dep't of the Treasury-I.R.S. v. Fed. Labor Relations Auth.*, 521 F.3d 1148, 1155 n.4 (9th Cir. 2008). The Supreme Court and this Court have recognized that a monetary award may be equitable in two circumstances: (1) when it is "an attempt to give the plaintiff what he is entitled to as opposed to a substitute for a consequential loss," *id.*; or (2) "when it is merely incidental to or intertwined with injunctive relief," *Bayer*, 861 F.3d at 866. Both circumstances apply here.

First, the Court's order that United pay Plaintiffs' defense costs was "the very thing to wh[ich] [Plaintiffs] were entitled" under the insurance policies. *Dep't of the*

55

*Treasury*, 521 F.3d at 1155 n.4. It was not an attempt to compensate Plaintiffs for consequential harms *separate* from the denial of the money to which they were entitled. In *Department of the Treasury*, for example, this Court held that an order requiring the United States to pay overtime compensation required by an arbitration award was equitable because it was "the very thing" to which the employees were entitled. *Id.* Here, because the District Court awarded Plaintiffs the very money to which they were entitled, that award is properly characterized as equitable.

Second, the award of backward-looking defense costs is also equitable because it is "incidental to or intertwined with injunctive relief," *Bayer*, 861 F.3d at 866—here, the injunction requiring United to pay forward-looking defense costs. Courts have held that money damages in the form of back pay in employment discrimination cases are equitable "when awarded as a complement to, rather than in addition to and distinct from, injunctive reinstatement." *Id.*; *see also Jun Yu v. Idaho State Univ.*, No. 4:15-cv-00430, 2019 WL 845866, at *2-3 (D. Idaho Feb. 21, 2019) (explaining that front pay and back pay are equitable and denying jury trial). Here, the award of backward-looking defense costs is like an award of back pay: it is an "integral part" of the forward-looking equitable relief. *Lutz v. Glendale Union High Sch.*, 403 F.3d 1061, 1068 (9th Cir. 2005) (citation omitted) (explaining why back pay is equitable).

United argues that the District Court erred in relying on *American Motorists Insurance Co. v. Superior Court*, 68 Cal. App. 4th 864, 874 (1998), because that was (1) a state court case that (2) addressed an insurer's claim for equitable recoupment of defense costs the insurer had already paid. Br. 66-67. But as to the first point, while United is correct that the Seventh Amendment does not apply to state courts, United does not grapple with the many decisions of *this federal Court* making clear that monetary relief is often equitable. As to the second point, United never explains why that distinction matters, and courts in this Circuit have treated monetary relief to an insured for defense costs wrongfully withheld as equitable, just as *American Motorists* treated monetary relief to an insurer for defense costs wrongfully paid as equitable. *See, e.g.*, *Foxfire, Inc. v. New Hampshire Ins. Co.*, Nos. C-91-2940, C-91-4364, 1994 WL 361815, at *5 (N.D. Cal. July 1, 1994); *see also Feld v. Fireman's Fund Ins. Co.*, No. 12-1789, 2019 WL 1453314, at *2 (D.D.C. Apr. 2, 2019).

Finally, as even United recognizes, it would be "utterly impracticable for a jury to wade through, comprehend, and disentangle a long account" of fees and expenses. *U.S. Fid. & Guar. Co. v. Super. Ct.*, 204 Cal. App. 3d 1513, 1529 (1988) (citation omitted). That is why "the right to trial by jury does not apply" to a determination of attorney's fees in the ordinary case. *Id.* at 1530; *see Finato v. Fink*, 803 F. App'x 84, 89 (9th Cir. 2020). Although United tries to distinguish these

57

attorney's fees as representing damages, United itself has acknowledged that this issue is similarly ill-suited for jury determination. *See* 2-ER-171 ("United National recognizes the hardship that would be placed on citizens of this District as jurors parsing fee and cost charges spread across thousands of pages of dense documents. Before attempting this, United National is prepared to meet and confer with plaintiffs about alternatives . . . ."); SER-7 (same). That acknowledgment gives away the game: United does not seriously want a jury trial; it simply wants to delay even further its obligation to pay. This Court should firmly reject that effort.

## CONCLUSION

The Court should affirm the District Court's grant of summary judgment to Plaintiffs, as well as its equitable order requiring United to pay all defense costs.

Dated: June 27, 2024                          Respectfully submitted,

                                              *s/ Samir Deger-Sen*

Brook B. Roberts                              Samir Deger-Sen
Steven Lesan                                  LATHAM & WATKINS LLP
James A. Tabb                                 1271 Avenue of the Americas
LATHAM & WATKINS LLP                          New York, NY 10020
12670 High Bluff Drive                        (212) 906-1200
San Diego, CA 92130
(858) 523-5400                                Christine C. Smith
                                              LATHAM & WATKINS LLP
                                              555 Eleventh Street, NW
                                              Suite 1000
                                              Washington, DC 20004
                                              (202) 637-2200

*Counsel for Appellees L.A. Terminals, Inc. and Soco West, Inc.*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8.  Certificate of Compliance for Briefs

**9th Cir. Case Number(s)**  23-55483

I am an attorney for Appellees L.A. Terminals, Inc. and Soco West, Inc.

This brief contains 13,980 words, including any words manually counted in any visual images, and excluding the items exempted by Fed. R. App. P. 32(f).  The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[X] complies with the word limit of Cir. R. 32-1.

[  ] is a cross-appeal brief and complies with the word limit of Cir. R. 28.1-1.

[  ] is an amicus brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[  ] is for a death penalty case and complies with the word limit of Cir. R. 32-4.

[  ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [  ] it is a joint brief submitted by separately represented parties;
    [  ] a party or parties are filing a single brief in response to multiple briefs; or
    [  ] a party or parties are filing a single brief in response to a longer joint brief.

[  ] complies with the length limit designated by court order dated _____.

[  ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).


**Signature** s/ *Samir Deger-Sen*        **Date** June 27, 2024

**ADDENDUM**

**Pursuant to 9th Cir. R. 28-2.7**

**ADDENDUM**

**TABLE OF CONTENTS**

| Description | Page |
| --- | --- |

Cal. Civ. Code § 2860(a)-(b)........................................................... ADD-1

## CAL. CIV. CODE § 2860

**§ 2860.  Conflict of interest; duty to provide independent counsel; waiver; qualifications of independent counsel; fees; disclosure of information**

(a)  If the provisions of a policy of insurance impose a duty to defend upon an insurer and a conflict of interest arises which creates a duty on the part of the insurer to provide independent counsel to the insured, the insurer shall provide independent counsel to represent the insured unless, at the time the insured is informed that a possible conflict may arise or does exist, the insured expressly waives, in writing, the right to independent counsel.  An insurance contract may contain a provision which sets forth the method of selecting that counsel consistent with this section.

(b)  For purposes of this section, a conflict of interest does not exist as to allegations or facts in the litigation for which the insurer denies coverage; however, when an insurer reserves its rights on a given issue and the outcome of that coverage issue can be controlled by counsel first retained by the insurer for the defense of the claim, a conflict of interest may exist.  No conflict of interest shall be deemed to exist as to allegations of punitive damages or be deemed to exist solely because an insured is sued for an amount in excess of the insurance policy limits.

\* \* \*